**Case No. 26-20052**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

Harriet Payne; Charles Payne, Jr.; Cavin Payne; Stephanie Payne; Betty Morrison; Kizz Goins; Katania Dearborne; Robert Payne,

*Plaintiffs – Appellees*

v.

City of Houston, Texas
*Defendant-Appellant*

---

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
No. 4:23-CV-4686

---

# BRIEF OF APPELLEES

---


Paul A. Grinke (SBN 24032255)
Aaron Dekle (SBN 24100951)
Ben Crump Law, PLLC
5 Cowboys Way, Suite 300
Frisco, Texas 75034
(972) 942-0494
paul@bencrump.com
aaron@bencrump.com

Carl L. Evans, Jr. (SBN 24056989)
James E. Sherry* (SBN 24086340)
Sarah E. Courtney (SBN 24142805)
McCathern Shokouhi & Evans PLLC
3710 Rawlins St., Ste 1600
Dallas, Texas 75219
(214) 741-2662
cevans@mccathernlaw.com
jsherry@mccathernlaw.com
scourtney@mccathernlaw.com
* *Lead counsel on appeal*

*Counsel for Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Appellees Harriet Payne, Charles Payne, Jr., Cavin Payne, Stephanie Payne, Betty Morrison, Kizz Goins, Katania Dearborne, and Robert Payne.
2. Appellees' counsel Paul A. Grinke, Aaron Dekle, Ben Crump Law, PLLC, Carl L. Evans, Jr., James E. Sherry, Sarah E. Courtney, and McCathern Shokouhi & Evans, PLLC.
3. Appellant City of Houston, Texas.
4. Appellant's counsel Christy L. Martin and Melissa Azadeh, City of Houston Legal Department.

Dated: September 1, 2026

*/s/ James E. Sherry*
James E. Sherry
*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees agree with Appellant that the Court's decisional process would be significantly aided by oral argument.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** .......... ii
**STATEMENT REGARDING ORAL ARGUMENT** .......... iii
**TABLE OF AUTHORITIES** .......... vi
**JURISDICTIONAL STATEMENT** .......... 1
**STATEMENT OF ISSUES** .......... 2
**STATEMENT OF THE CASE** .......... 3
- **A. Introduction** .......... 3
- **B. Facts** .......... 4
  - **1. The Fatal Collision and Its Cause: Cabrera's Unconscionable Speeding** .......... 4
  - **2. Mr. Payne's Death** .......... 6
  - **3. The Moving Force Behind Mr. Payne's Death: Houston's Policy of Allowing Police Officers to Drive at Any Speed They Deem Safe** .......... 10

**SUMMARY OF THE ARGUMENT** .......... 19
**ARGUMENT** .......... 21
- **I. THE DISTRICT COURT CORRECTLY DENIED HOUSTON'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW BECAUSE SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT** .......... 21
  - **A. The Rule 50 Standard of Review Favors Preservation of the Jury's Verdict** .......... 21
  - **B. The Jury Had a Legally Sufficient Basis to Find that Cabrera Violated Charles Payne Sr.'s Substantive Due Process Rights.** .......... 22
    - **1. *Lewis* does not require intent to harm in every police-caused collision.** .......... 22
    - **2. Deliberate indifference is the appropriate standard under the circumstances presented here.** .......... 24
    - **3. Substantial evidence supports the jury's decision that Cabrera acted with deliberate indifference.** .......... 26
  - **C. Substantial Evidence Supports the Jury's Finding of Municipal Liability Under *Monell*** .......... 28
    - **1. Plaintiffs identified the correct policymaker at trial** .......... 29

2. Plaintiffs presented substantial evidence of a municipal policy of which the policymaker had actual or constructive knowledge ......30

3. Plaintiffs presented substantial evidence that the policy was the moving force behind the deprivation of Mr. Payne's constitutional rights ......35

II. HOUSTON IS NOT ENTITLED TO A NEW TRIAL ......39

A. Standard of Review and Harmless Error Principles......39

B. The Trial Court's Charge Was Neither Erroneous nor Harmful......40

1. Legal standards......40

2. The trial court's denial of an instruction naming the policymaker was neither erroneous nor harmful ......42

3. Instruction No. 7 was neither erroneous nor harmful ......47

4. The Trial Court did not err by refusing Houston's requested instruction on the Texas Transportation Code......48

5. The Trial Court did not err by instructing the jury on Plaintiffs' *Monell* theories of liability ......49

6. The Trial Court did not use the wrong due process standard ......50

7. The Trial Court did not use the wrong standard for deliberate indifference......50

8. The charge did not "dilute" the moving force standard......51

9. The charge was not erroneous in submitting training and supervision theories in a single question. ......52

C. The Trial Court's Evidentiary Rulings Were Neither Erroneous nor Harmful......52

D. The Trial Court Did Not Subject Houston to "Trial by Ambush" ......55

E. The Damages Awarded Were Not Excessive ......57

CONCLUSION......58

CERTIFICATE OF SERVICE ......59

CERTIFICATE OF COMPLIANCE ......60

## TABLE OF AUTHORITIES

### CASES

*Adams v. Mem'l Hermann,*
973 F.3d 343 (5th Cir. 2020) ....................................................................41, 52

*Baron v. Suffolk Cnty. Sheriff's Dep't,*
402 F.3d 225 (1st Cir. 2005).........................................................................44

*Browder v. City of Albuquerque,*
787 F.3d 1076 (10th Cir. 2015) ..................................................................25, 28

*Burge v. Tammany Par.,*
335 F.3d 363 (5th Cir. 2003) .........................................................................52

*City of Canton, Ohio v. Harris,*
489 U.S. 378 (1989)...............................................................31, 32, 33

*City of St. Louis v. Praprotnik,*
485 U.S. 112 (1988)......................................................................................29

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998)..................................................................................passim

*Comm'rs of Bryan Cnty. v. Brown,*
520 U.S. 397 (1997)...........................................................30, 31, 32, 36

*Connick v. Thompson,*
563 U.S. 51 (2011)...................................................................................30, 31

*Conway v. Chem. Leaman Tank Lines, Inc.,*
687 F.2d 108 (5th Cir. 1982) .........................................................................55

*Crear v. Horn,*
578 F. App'x 435 (5th Cir. 2014) ..................................................................39

*Daniels v. City of Dallas,*
272 Fed. Appx. 321 (5th Cir. 2008)...........................................................26, 27

*Davis v. Avondale Indus., Inc.,*
975 F.2d 169 (5th Cir. 1992) ...............................................................40, 41, 50

*Dean ex rel. Harkness v. McKinney,*

976 F.3d 407 (4th Cir. 2020) ....................................................................25

*Eastman Chem. Co. v. Plastipure, Inc.*,
775 F.3d 230, 238 (5th Cir. 2014) ........................................................40

*F & S Offshore, Inc. v. K.O. Steel Castings, Inc.*,
662 F.2d 1104 (5th Cir. 1981) ...............................................................55

*Flores v. Cameron Cnty., Tex.*,
92 F.3d 258 (5th Cir. 1996) ...................................................................43

*Flores v. City of S. Bend*,
997 F.3d 725 (7th Cir. 2021) ...........................................................25, 27

*Groden v. City of Dallas, Tex.*,
826 F.3d 280 (5th Cir. 2016) ....................................................28, 29, 30

*Heckman v. Gonzalez-Caballero*,
65 F.4th 222 (5th Cir. 2023) ..................................................................39

*Hicks-Fields v. Harris Cnty., Texas*,
860 F.3d 803 (5th Cir. 2017) .................................................................31

*Hill v. Shobe*,
93 F.3d 418 (7th Cir. 1996) ...................................................................26

*Jennings v. Jones*,
587 F.3d 430 (1st Cir. 2009)...................................................................44

*Kanida v. Gulf Coast Med. Pers., L.P.*,
363 F.3d 568 (5th Cir. 2004) ...........................................................41, 45

*Kitchen v. Dallas Cnty., Tex.*,
759 F.3d 468 (5th Cir. 2014) .................................................................31

*Littell v. Houston Indep. Sch. Dist.*,
894 F.3d 616 (5th Cir. 2018) .................................................................32

*Loera v. Kingsville Indep. Sch. Dist.*,
151 F.4th 813 (5th Cir. 2025) .........................................................36, 37

*Lyne v. R.N. Adams Constr. Co.*,
402 F.2d 323 (5th Cir. 1968) .................................................................47

*McCaig v. Wells Fargo Bank (Tex.), N.A.*,

788 F.3d 463 (5th Cir. 2015) ....................................................................21

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)...................................................................................passim

*Montano v. Orange Cnty., Tex.*,
842 F.3d 865 (5th Cir. 2016) ..........................................................31, 35, 57

*Moore v. LaSalle Mgmt. Co.*,
41 F.4th 493 (5th Cir. 2022) ....................................................31, 32, 34, 38

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
898 F.3d 461 (5th Cir. 2018) ...............................................................21, 22

*O'Neal v. Cazes*,
257 F. App'x 710 (5th Cir. 2007) ...........................................................25

*Occidental Fire & Cas. Co. of N.C. v. Fox*,
161 F.4th 849 (5th Cir. 2025) ...............................................................21

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ...........................................................passim

*Rodriguez v. Crown Equip. Corp.*,
923 F.2d 416 (5th Cir. 1991) ...................................................................55

*Russell v. Plano Bank & Trust*,
130 F.3d 715 (5th Cir. 1997) .............................................................42, 43

*Sauers v. Borough of Nesquehoning*,
905 F.3d 711 (3d Cir. 2018) .....................................................................25

*Shows v. Jamison Bedding, Inc.*,
671 F.2d 927 (5th Cir. 1982) ...................................................................57

*Smith v. Walden*,
228 F.3d 408 (Table) (5th Cir. 2000) ................................................26, 27

*Soltesz v. Rushmore Plaza Civic Ctr.*,
847 F.3d 941 (8th Cir. 2017) ...................................................................44

*St. Maron Props., L.L.C. v. City of Houston*,
78 F.4th 754 (5th Cir. 2023) .........................................................35, 37, 51

*Thompson v. McGehee*,
183 F.4th 353 (5th Cir. 2026) ............................................................................30

*Thompson v. Upshur Cnty.*,
245 F.3d 447 (5th Cir. 2001) ............................................................................52

*Trammel v. Fruge*,
868 F.3d 332 (5th Cir. 2017) ............................................................................52

*United States v. Arthur*,
51 F.4th 560 (5th Cir. 2022) ............................................................................40

*U.S. v. Brannan*,
98 F.4th 636 (5th Cir. 2024) ............................................................................40

*U.S. v. Cessa*,
856 F.3d 370 (5th Cir. 2017) ............................................................40, 41, 44

*U.S. v. Dixon*,
185 F.3d 393 (5th Cir. 1992) ............................................................................41

*U.S. v. Green*,
272 F.3d 748 (5th Cir. 2001) ............................................................................43

*U.S. v. Greenlaw*,
84 F.4th 325 (5th Cir. 2023) ............................................................................45

*U.S. v. Hernandez-Adame*,
157 F.4th 662 (5th Cir. 2025) ............................................................................40

*United States v. Hunt*,
794 F.2d 1095 (5th Cir. 1986) ............................................................................45

*U.S. v. MacHauer*,
403 Fed. Appx. 967 (5th Cir. 2010)....................................................................45

*U.S. v. Richardson*,
676 F.3d 491 (5th Cir. 2012) ............................................................................40

*U.S. v. Rodrigo*,
934 F.2d 595 (5th Cir. 1991) ............................................................................43

*U.S. v. Rubio*,
834 F.2d 442 (5th Cir. 1987) ......................................................................45, 46

*Valle v. City of Houston*,
613 F.3d 536 (5th Cir. 2010) ....................................................................36, 37

*Webb v. Sloan*,
330 F.3d 1158 (9th Cir. 2003) ........................................................................44

*Webster v. City of Houston*,
735 F.2d 838 (5th Cir. 1984) (en banc) ...............................................31, 35, 43

*Whitehead v. Food Max of Miss., Inc.*,
163 F.3d 265 (5th Cir. 1998) ..........................................................................39

**STATUTES AND RULES**

28 U.S.C. § 1291 ...............................................................................................1

Fed. R. Civ. P. 51 ...................................................................................41, 42

Fed. R. Civ. P. 61 ............................................................................................55

Fed. R. App. P. 32 ...........................................................................................60

5th Cir. R. 32.1 .................................................................................................60

Tex. Transp. Code § 541.201 ...........................................................................48

Tex. Transp. Code § 545.365 ...........................................................................49

Tex. Transp. Code § 546.001 ...........................................................................49

Tex. Transp. Code § 546.002 ...........................................................................49

**OTHER AUTHORITIES**

5th Cir. Pattern Civil Jury Instructions § 10.5 ................................................44, 51

## JURISDICTIONAL STATEMENT

This is an appeal from a certified final judgment under Federal Rule of Civil Procedure 54(b) following a jury trial. The Court has appellate jurisdiction over the certified final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the Trial Court correctly denied Houston's motion for judgment as a matter of law because substantial evidence supported the jury's findings that Officer Cabrera violated Charles Payne Sr.'s substantive due process rights and that the violation resulted from a customary municipal policy attributable to Houston under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).
2. Whether the Trial Court acted within its discretion in denying Houston's motion for new trial where the jury charge and evidentiary rulings were not erroneous or harmful and the jury's compensatory damages award was not excessive.

## STATEMENT OF THE CASE

### A. Introduction

This case arises from a fatal car crash caused by Houston Police Officer Christopher Cabrera, who drove more than 70 m.p.h. on a 35 m.p.h., heavily-trafficked, known-dangerous city street, without activating his lights or siren, and for no better reason than wanting to go fast. The question before this Court is whether municipal liability may be imposed on Houston for the death of Appellees' husband and father, Charles Payne, Sr. The answer is yes, because Houston admitted at trial that Cabrera's unconscionably reckless driving was consistent with an official policy, promulgated by its Chief of Police and observed as a customary practice, that allows officers to drive at any speed they deem safe, for any reason, even absent an emergency. Because Houston's policy enables this kind of recklessly lethal driving, and Houston has done nothing to revise its policy to prevent future needless deaths, Houston's conduct before and after Mr. Payne's killing demonstrates the deliberate indifference necessary to impose municipal liability under *Monell*.

How would the Court decide this case if Cabrera had t-boned and killed a bus full of schoolchildren – or any of the judges on this Court, or their families –instead of a solitary older man driving home the day after Christmas? These considerations shouldn't matter, but Houston thinks otherwise, shamelessly arguing that Mr. Payne's bereaved survivors should have no remedy because Mr. Payne spent time

in prison in the 1980s and may have used marijuana at some point in the weeks before Cabrera carelessly killed him. But Houston doesn't get to choose its victims any more than Mr. Payne got to choose the circumstances of his violent death. Anyone driving on North Shepherd Road the morning of December 26, 2021 might have died as the result of Houston's disregard for the safety of innocent drivers and pedestrians, and Houston may not escape liability for its deliberate indifference to an unconstitutional policy that directly caused an inevitable consequence: the senseless killing of an innocent man.

## B. Facts

### 1. The Fatal Collision and Its Cause: Cabrera's Unconscionable Speeding

Shortly after beginning his shift at 6:00 a.m. the morning of December 26, 2021, Cabrera was called to relieve another officer who had arrested a suspected drunk driver. ROA.6555–56. Cabrera transported the suspect, who was already in custody, to the Houston Joint Processing Center ("JPC"), where Cabrera remained for several hours completing the booking before leaving to return to his station to finish paperwork, stopping for breakfast along the way. ROA.6554–57, 7757.

While driving back after breakfast, Cabrera reached over 70 m.p.h. northbound on North Shepherd Drive—a heavily-trafficked six-lane street posted at 35 m.p.h.—with his emergency lights and siren off. ROA.6554–58, 6563, 6425–26,

6436–39. This was not an isolated lapse: Cabrera repeatedly exceeded the speed limit by more than 20 m.p.h. during his return drive that day. ROA.6547, 6574-79.

Meanwhile, Charles Payne, Sr. was driving southbound on North Shepherd intending to turn left onto Thornton Road. ROA.6432. He entered the turn lane and slowed as he approached the intersection, from which any northbound traffic traveling near the speed limit would have been visible in all three northbound lanes. ROA.6398, 6433, 6436, 6438-39. Appellees' accident-reconstruction expert opined that Payne turned at a time when "he could see enough of the roadway to know . . . that he would not get hit by a vehicle going the speed limit." ROA.6398, 6438-39.

But Cabrera was not traveling near the speed limit and was not watching the road—he admits he looked down at his tablet moments before the collision, then looked up to see a car materialize from nowhere before impact. ROA.6562, 6564–67, 7369, 7759. The video even shows Cabrera drifting into the middle lane just shortly before the collision. ROA. 7369, 6403–06. Cabrera t-boned Payne, who was making a lawful left turn and could not anticipate a vehicle approaching at twice the speed limit. ROA.6453–54, 6438–39, 6419, 6398, 6431–33, 6424–28, 7479–94. Cabrera braked and swerved right just before impact, ROA.6426–27, but Plaintiffs' reconstruction expert concluded that Cabrera's speed was the actual cause of the collision: "Had Officer Cabrera been traveling the speed limit, he would not have hit Mr. Payne's vehicle." ROA.6400, 6431–33, 6419.

The reconstruction evidence quantified that causation. Five seconds before impact, Cabrera was traveling 70 m.p.h.—roughly 100 feet per second—while Payne began his left turn two seconds before impact at 15 m.p.h. ROA.6425-27. Cabrera did not brake until nine-tenths of a second before the collision, striking the passenger-side front of Payne's Cadillac at roughly a 90-degree angle. ROA.6427-28. Photographs of the resulting damage and surveillance footage from three locations were shown to the jury. ROA.7479-94,7369, 6403-06.

Cabrera's speed both increased the force of the collision and the distance needed to stop: doubling a vehicle's speed quadruples its stopping distance, so a car traveling 35 m.p.h. typically stops within about 55 feet, while one traveling 70 m.p.h. requires more than 200 feet. ROA.6428-31. By the time Cabrera reacted, his speed had already placed him too close to Payne to avoid impact. ROA.6453-54. Had Cabrera been traveling the posted 35 m.p.h., Payne would have cleared North Shepherd before Cabrera even reached the intersection, since at that speed Cabrera would have covered only half the distance he traveled during those five seconds. ROA.6400, 6431-33, 6435-36.

### 2. Mr. Payne's Death

The collision caused catastrophic blunt-force trauma that killed Mr. Payne. The physical evidence, reconstruction testimony, and autopsy established that the

collision—not a preexisting condition or post-collision medical intervention—caused his death.

### *a. The collision caused devastating internal injuries*

Payne survived the initial impact, but his injuries were fatal. ROA.7455-63. His autopsy was performed the next day by Dr. Jennifer Ross, a Harris County assistant medical examiner. ROA.7098-7107, 7110-11.

Externally, Payne had numerous abrasions and scratches across his scalp, forehead, face, chest, back, arms, and legs, including one two-inch scalp abrasion deeper than the rest. ROA.7111-14, 7123-24.

His internal injuries were more severe: a fractured fifth cervical vertebra; fractured ribs on both sides of his chest, front and back; a fractured sternum; and a displaced collarbone. ROA.7112, 7120-21. The crash completely transected his aorta—severing the vessel so the upper portion separated from the lower, leaving a space through which blood could freely escape and preventing blood from reaching the heart and other organs. ROA.7113-14, 7119-20. Dr. Ross determined the collision caused this transection, describing it as a rapid acceleration-deceleration injury requiring substantial force and associated with severe motor-vehicle collisions. ROA.7119-20.

The transected aorta produced massive internal bleeding: roughly 1,000 milliliters of blood—about half of a two-liter bottle—accumulated in the right side

of Payne's chest, most from the severed aorta with additional bleeding from his fractured ribs. ROA.7121-23. Another 250 milliliters accumulated in his abdomen after the collision tore his diaphragm and injured his liver and spleen, allowing chest blood to pass through the torn diaphragm and those organs to contribute further bleeding. ROA.7122-24.

Relying on EMS records, Dr. Ross and Houston's medical expert both concluded that Payne survived the crash and was found with a heartbeat and blood pressure at the scene. ROA.6812-13, 7126-27. Payne was transported to the hospital while resuscitative efforts continued and was pronounced dead four minutes after arrival. ROA.7126-27.

#### ***b. The collision caused Charles Payne's death***

After examining Payne's body and applying accepted forensic-pathology methods, Dr. Ross concluded to a reasonable degree of medical probability that Payne died from multiple blunt-force injuries—the fractured cervical vertebra, transected aorta, torn diaphragm, liver and spleen injuries, and extensive blood loss, excluding infection, cancer, natural disease, and heart attack as the cause. ROA.7108-11, 7126-27. Her conclusion was independent of the collision footage, which she had not watched before the autopsy, and she testified as a neutral medical examiner rather than as an expert retained by either party. ROA.7132-34, 7142.

The autopsy did identify preexisting conditions—including greater than 90-percent narrowing in a branch of Payne's left coronary artery, an elevated post-collision glucose reading, and an enlarged thyroid—but Dr. Ross testified none caused or contributed to his death. ROA.7124-31, 7141-42.

City of Houston's retained expert, Dr. Totz, could not establish otherwise. Although he initially opined that Payne was experiencing an acute heart attack around the time of the collision, ROA.6803-08, he admitted on cross-examination that he could not say to a reasonable degree of medical certainty that Payne was having a heart attack before the collision, only that evidence of one existed afterward. ROA.6825-26. The EKG on which he relied was taken nearly thirty minutes after the crash, and he agreed impaired blood flow, trauma, and blood loss can affect EKG readings and do not prove a preceding heart attack. ROA.6831-32, 7127-28. He also conceded Payne's glucose measurement was taken after the accident and that trauma and stress can elevate blood glucose. ROA.6816-18, 6824. Dr. Ross's autopsy—not a post-collision EKG or glucose reading—established what killed Charles Payne. ROA.7108-10, 7126-28, 7455-63.

#### *c. The medical examiner rejected City of Houston's theory that CPR severed Charles Payne's aorta*

Dr. Totz also theorized that CPR chest compressions caused the transected aorta. ROA.6811-16. Dr. Ross rejected that theory, testifying she had never seen an aortic transection caused by CPR and that Payne's transection instead resulted from

a severe injury such as a motor-vehicle collision, ROA.7130. Dr. Totz himself agreed that a transected aorta is associated with sudden rapid acceleration or deceleration and that such injuries are ordinarily fatal—approximately 80 percent of patients with an aortic transection die at the scene. ROA.6821-23.

Unlike Dr. Ross, Dr. Totz had never performed an autopsy, was not a pathologist, forensic pathologist, neuropathologist, anatomic pathologist, or medical examiner, and had never examined Payne's body, treated him, or spoken with Dr. Ross. ROA.6819-20, 6829-30. Dr. Ross, who actually examined Payne's body, identified the fatal injuries, determined the cause of death, and testified unequivocally that the collision transected his aorta and that he died from the resulting multiple blunt-force injuries. ROA.7098-99, 7119-20, 7126-27, 7130.

### 3. The Moving Force Behind Mr. Payne's Death: Houston's Policy of Allowing Police Officers to Drive at Any Speed They Deem Safe

Cabrera's speeding was not an isolated departure from policy: Houston's designated policy witness, Captain Duplechain, testified that his conduct was consistent with official policy and training. Evidence also showed that officers routinely drove at extreme speeds; Cabrera had done so repeatedly without discipline; Houston did nothing to monitor officer speeding though it could; and it changed nothing about its policy after Mr. Payne's death.

#### *a. Houston's designated policy witness testified that Houston's official policy allowed Cabrera to drive 70 m.p.h. in a 35-m.p.h. zone in the absence of an emergency*

The City designated Captain Duplechain as both a fact witness and an expert on HPD policies and practices governing the operation of police vehicles. ROA.6607-10. Duplechain had helped draft those policies according to the Chief of Police's instructions about "what they wanted the policy to be," and he agreed he possessed broad personal knowledge of the policies and practices applicable to Cabrera and all other Houston officers. ROA.6607-10, 6635-36.

Duplechain testified that Houston's official policy and training allow officers to drive whatever speed they decide is appropriate based on the "totality of the circumstances," and that Cabrera's 70 m.p.h. on North Shepherd that day was consistent with it: "If in the totality of the circumstances, officers look at the condition of the roadway, the lighting conditions, the weather conditions, the light traffic conditions in both directions, it was not unreasonable for an HPD officer to drive 70 miles an hour on North Shepherd at that time." ROA.6613-18, 6617, 6640. He confirmed on cross-examination that "a reasonable officer could drive 70 miles an hour on North Shepherd under the circumstances that Officer Cabrera did"—an opinion informed by having personally driven that roadway "well over a thousand times." ROA.6637, 6640, 6655. Duplechain acknowledged that the City had designated the relevant stretch, including its intersection with Thornton Road, as part

of its High Injury Network, and that City crash data reflected fifty crashes there in the six months before this collision. ROA.6656-59, 7665-7701, 7674, 8402–03. He maintained that 70 m.p.h. was a reasonable speed under Houston's policy even absent an emergency, and acknowledged he personally had driven 70 m.p.h. on that stretch while on duty and not responding to an emergency. ROA.6617, 6628-29, 6640.

Houston's policy, as Duplechain described it, treats the posted speed limit as irrelevant even in non-emergencies, leaving the decision to officers' unfettered subjective judgment based on the "totality of the circumstances." ROA.6617, 6624, 6640. Cabrera testified that "due regard" for the public includes exceeding posted speed limits in non-emergencies. ROA.6599. A circular signed by the Chief of Police only four days after Mr. Payne's death reiterated this policy without modification: officers must use their own "good judgment" and exercise "due care" when choosing a "speed that is safe and appropriate for the situation, taking into consideration the road conditions and the volume of vehicular and pedestrian traffic" – but not the speed limit, which is unmentioned – "regardless whether [the officer is] responding to an emergency call." ROA.6629-30, 6632-33, 7410.

Duplechain agreed the circular was consistent with Houston's policy at the time of Mr. Payne's death, and identified the Chief as both its author and as HPD's policymaker. ROA.6629-30, 6632-33, 7410. Duplechain lacked final authority to

enact or revise HPD's general orders—the Chief never delegated that authority to him—and merely drafted policies based on the Chief's instructions. ROA.6635-36.

#### *b. City of Houston also trained its officers that Cabrera's conduct was permissible*

Duplechain's training testimony matched his policy testimony: Cabrera's driving was consistent with his HPD training, which teaches officers to assess the "totality of the circumstances"—roadway conditions, traffic density, customary traffic flow, and lines of sight—and use judgment. ROA.6622-24.

Plaintiffs' police-policy expert, Christopher Darcy, reached the same conclusion. After reviewing Department policies, Internal Affairs materials, depositions, and the trial testimony of Cabrera and Duplechain, Darcy testified that HPD's pre-crash driving policy permitted officers to drive according to their assessment of the "totality of the circumstances" without regard to the speed limit. ROA.7153-55. He contrasted that with the ordinary rule that, absent an emergency exception, the speed limit governs—noting that some police departments cap even emergency-response speed. ROA.7159-61. Darcy disagreed with Duplechain's view that Cabrera's speed was reasonable, explaining he had never encountered a policy that simultaneously required "due regard" for public safety while permitting 70 m.p.h. in a 35-m.p.h. zone under ordinary conditions. ROA.7198-99, 7268-70.

Cabrera was not rushing to an unfolding emergency: he was returning to his station to finish paperwork after stopping for breakfast. ROA.6554-55, 6603. But

Cabrera understood that because his underlying "Code 2" assignment technically remained open until that paperwork was completed, he remained "responding to an emergency" all day unless the call was withdrawn. ROA.6601-02. Darcy explained why that was dangerous: staying assigned to a call after the emergency ends does not authorize excessive speed. ROA.7195-97. Cabrera's testimony confirmed that danger: because he remained assigned to a Code 2 call, he believed Houston's policy allowed him to exceed the speed limit. ROA.6599, 6601-02. Cabrera testified he was driving in accordance with Department policy at the time of the fatal collision. ROA.6599, 6601-02, 6640.

##### *c. The evidence showed that Cabrera repeatedly drove at extreme speeds before the collision and was never disciplined for doing so before killing Mr. Payne*

Cabrera admitted he did not know the speed limit on North Shepherd, did not know his own speed when the crash occurred, and was not watching his speedometer. ROA.6562, 6564. GPS evidence reconstructing his route that day from the JPC to his station, ROA.7465-69, 7626-64, showed he repeatedly exceeded posted limits before ever reaching North Shepherd: 57 m.p.h. on Victory Street (35 m.p.h.), ROA.6574-75; also 65 then 66 m.p.h. on Little York Road (35 m.p.h.), ROA.6575-77; and 57 m.p.h. on Studemont Street (30 m.p.h.), ROA.6577-78. He then turned onto North Shepherd at 59 m.p.h., accelerating to 64 and ultimately 70

m.p.h. ROA.6578-79. Cabrera testified he did not know the speed limit on any of those streets. ROA. 6574, 6575, 6578.

Internal Affairs' post-collision review of AVL data from September 1 through December 26, 2021 identified numerous additional occasions on which Cabrera reached 70 m.p.h. or more on surface streets, including recorded speeds as high as 102 m.p.h.—none associated with responding to a call. ROA.6579-82, 7760. Cabrera was never disciplined for those instances, and no one disciplined or even questioned him about excessive speed until after Payne died. ROA.6582-83, 6600.

#### ***d. Cabrera was not the only HPD officer driving at extreme speeds***

Extreme-speed driving extended beyond Cabrera. Darcy reviewed one month of AVL data for police vehicles operating in a five-mile area around Cabrera's station—recording identifying information, GPS coordinates, location, date, and vehicle velocity. ROA.7941–8396, 7369, 7166-68, 7207-12. Walking the jury through examples, Darcy identified HPD vehicles traveling 97, 86, 92, 91, 89, 94, 85, and 91 m.p.h. ROA.7210-11. Although the AVL data did not identify the applicable speed limit or precise call assignment for every data point, Darcy testified the frequency of 90-m.p.h.-range speeds was itself "shocking" from a police-practices standpoint, regardless of whether an officer was responding to an emergency. ROA.7212.

Darcy also reviewed Internal Affairs investigations of other officers whose driving came under scrutiny only after crashes occurred: Officer Valdez, who drove 80 m.p.h. in a 30-m.p.h. residential area before crashing, after which a retrospective 90-workday AVL audit identified additional excessive-speed events when not responding to emergencies, ROA.7214-15; and Officer Curtis, whose post-accident AVL audit revealed multiple instances of extreme speed, including 105 m.p.h. in a 40-m.p.h. zone, 98 m.p.h. in a 45-m.p.h. zone, and other speeds ranging into the 90s through 114 m.p.h. ROA.7215-16. These incidents also resulted in deaths to civilians. ROA.6599-6600. These incidents, together with Duplechain's testimony, Cabrera's history, and the broader AVL data, supported Darcy's opinion that excessive speeding was not confined to a single officer. ROA.7162-64, 7214-16.

#### *e. HPD could monitor officer speeds before a crash occurred, but typically did not*

Duplechain admitted that, before Payne's death, HPD had the technological ability to track officers' speeds and audit that information, but when asked whether it typically did so, he answered, "No, sir." ROA.6625, 6627. He could identify only one instance in the preceding ten years in which he knew of an officer being disciplined for excessive speed before being involved in a wreck. ROA.6624-25.

Darcy testified that routine review of AVL data is a recognized supervisory mechanism for identifying dangerous driving before someone is injured, and that a preliminary review flagging officers driving 90 or 100 m.p.h. could identify a

problem warranting further investigation without the prohibitive burden the City suggested. ROA.7203-06. In Darcy's opinion, permitting such speeds to continue unmonitored demonstrated a lack of concern for both public and officer safety. ROA.7206-07.

##### *f. The policy operated exactly as Houston said it did when Cabrera killed Charles Payne*

Consistent with a policy treating the posted speed limit as irrelevant, Cabrera did not know the limit on North Shepherd or on the three streets he had sped through earlier that day. ROA.6562, 6573-79. And consistent with a policy entrusting officers with unfettered subjective judgment under the "totality of the circumstances," he had exceeded the limit on each street before reaching North Shepherd—up to 66 m.p.h. in 30- and 35-m.p.h. zones—and had done so many times before without discipline. ROA.6573-83.

That policy produced its inevitable result on North Shepherd. Cabrera knew the road carried substantial cross traffic and pedestrian traffic, ROA.6558, but was driving a marked vehicle without emergency lights or siren, ROA.6436-37, was not watching his speedometer, ROA.6562, 6564, and looked down and away from the road for a second shortly before the crash. ROA.6567. Eleven seconds before his recorded 70-m.p.h. reading he was already traveling 64 m.p.h., and he did not brake until nine-tenths of a second before impact. ROA.6423, 6426-27. Police policy expert Christopher Darcy concluded that Cabrera's decision to drive 70 m.p.h. in a

35-m.p.h. zone while not responding to an emergency constituted reckless disregard for human life. ROA.7270-71.

Houston never presented Cabrera's speed as contrary to its policy or training. Its designated policy witness maintained that a reasonable HPD officer could have driven 70 m.p.h. under Cabrera's circumstances and that his conduct was consistent with HPD's training; Cabrera himself testified he believed his driving complied with Department policy. ROA.6600-02, 6622-24, 6640. Houston allows officers not responding to an emergency to set their own speed, trained them accordingly, and never disciplined Cabrera before Mr. Payne's death despite repeated extreme speeds. On December 26, 2021, following Houston's official policy, he chose to drive 70 m.p.h. in a 35-m.p.h. zone, and the inevitable happened: he killed an innocent man.

## SUMMARY OF THE ARGUMENT

Houston's first rendition argument rests on a categorical rule that a police-caused collision can never violate substantive due process absent intent to harm. But the Supreme Court's decision in *Lewis* ties the required showing to the time and exigency an officer faces. Officer Cabrera faced no urgency: he was not pursuing a suspect or facing any emergency. He simply chose, with ample time to deliberate, to drive more than twice the posted speed limit on a busy city street. Circuit courts that have addressed the question since *Lewis* have consistently held that deliberate indifference, not intent to harm, governs non-emergency police driving of this kind, and this Court has never held otherwise. The record amply supports the verdict under that standard.

Houston's *Monell* arguments fare no better. Policymaker status is a question of law, and Plaintiffs identified Houston's Chief of Police as the policymaker at trial through Houston's own policy witness. That testimony, data showing officers, including Cabrera, repeatedly driving at speeds up to 85 and even over 100 m.p.h. with no corrective action, and Houston's own training testimony established a policy of letting officers disregard posted speed limits whenever they judged the "totality of the circumstances" warranted it. That policy, promulgated and perpetuated with deliberate indifference to its obvious consequences, put Cabrera's cruiser in Mr. Payne's path at the moment the collision became unavoidable, and was the moving

force behind the deprivation of Mr. Payne's constitutional rights. Houston's remaining arguments ask this Court to reweigh evidence the jury credited.

Houston's new trial request, reviewed even more deferentially, also fails. The jury charge tracked this Circuit's pattern instructions, and Houston's arguments mischaracterize the charge, press unpreserved complaints, and allege errors that were invited by Houston itself. None caused identified harm.

Houston's evidentiary complaints also fail. The AVL exhibit it now challenges was produced by Houston itself, foreclosing any claim of unfair surprise, and the excluded evidence concerning Mr. Payne's incarceration, divorce, and toxicology was properly weighed as more prejudicial than probative. The damages awarded were neither excessive nor shocking to the conscience.

This Court should affirm the Trial Court's certified final judgment on Appellees' *Monell* claim.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY DENIED HOUSTON'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW BECAUSE SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT.

#### A. The Rule 50 Standard of Review Favors Preservation of the Jury's Verdict.

This Court reviews a trial court's denial of a motion for judgment as a matter of law *de novo*, but where the motion "challenges the sufficiency of the evidence after a case tried by a jury," this Court's review is "especially deferential." *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 472 (5th Cir. 2015) (quotations omitted). Evidence is legally insufficient to support a jury verdict only "where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *Occidental Fire & Cas. Co. of N.C. v. Fox*, 161 F.4th 849, 867 (5th Cir. 2025) (quotations omitted). This Court will uphold a jury verdict "unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* (quotations omitted). The test is whether "substantial evidence" supports the verdict – *i.e.*, evidence that amounts to "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N. Cypress Med Ctr. Op. Co. v. Aeta Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018).

In conducting its review, this court "must draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [it]

might regard as more reasonable." *Id.* (quotations omitted). "[T]he court may not make credibility determinations or weigh the evidence, as those are jury functions." *N. Cypress Med. Ctr.*, 898 F.3d at 473 (quotations omitted).

### B. The Jury Had a Legally Sufficient Basis to Find that Cabrera Violated Charles Payne Sr.'s Substantive Due Process Rights.

Before analyzing municipal liability, the Court must decide the "distinct, anterior issue whether or not a constitutional violation occurred at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 857 (1998) (Kennedy, J. concurring). In this case, Cabrera's disregard for the safety of other drivers – in the absence of any countervailing exigency – meets the "conscience-shocking" standard that elevates a car crash into a constitutional violation.

#### 1. *Lewis* does not require intent to harm in every police-caused collision.

Houston's central argument is categorical: relying on *Lewis*, 523 U.S. 833 (1998), Houston contends that "[c]ar accidents resulting in unintended loss of life categorically fall below the threshold for substantive due process, *i.e.*, conduct that shocks the conscience ***in a constitutional sense***." (App. Br. at 22 (emphasis in original)). Based on this misreading of *Lewis*, Houston argues that police-caused car accidents can be conscience-shocking only where the officer acted with the intent to harm; conscious indifference is never enough. (App. Br. at 22-23).

But *Lewis* did not apply a categorical test. To the contrary, *Lewis* expressly recognized that the level of officer culpability necessary to shock the conscience "requires an exact analysis of [the] circumstances" of each particular case, since "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." 523 U.S at 850. Analyzing the circumstances of the police-caused accident before it, which occurred in the context of an officer's high-speed pursuit of fleeing suspects, the *Lewis* Court found two factors to be decisive: (1) the absence of any practical opportunity for "actual deliberation" by an officer giving chase; and (2) the "substantial countervailing interests" presented in the context of any high-speed pursuit. *Id.* at 851.

This case is different because Cabrera was not confronting a fleeing suspect or any other emergency circumstance that could justify his speed. Unlike an officer confronted with the "split second judgment" whether to pursue or continue the pursuit of a fleeing suspect, *id.* at 853 (quotations omitted), Cabrera had ample opportunity for "actual deliberation" when he made the decision to drive more than twice the posted speed limit in the absence of any emergency, *id.* at 851. And Cabrera confronted nothing like the need to "balance on the one hand the need to stop a suspect … and, on the other, the high-speed threat to all those" sharing the road when he made that fatal decision. *Id.* at 851.

Houston avoids analysis of the obvious differences between this case and *Lewis* by focusing on Cabrera's reaction in the final second before impact – as if Cabrera's braking and swerving indicate anything other than an instinctual attempt to save his own life. But the conscience-shocking decision that Cabrera made was the decision to drive at a dangerous speed on a known dangerous road. He made that decision long before he was confronted with the predictable consequences of that decision, and he made it with ample opportunity for actual deliberation. As he had done repeatedly that day, Cabrera chose to drive at a grossly excessive and dangerous speed for no good reason. Under these circumstances, the proper standard is deliberate indifference.

### 2. Deliberate indifference is the appropriate standard under the circumstances presented here.

This Court should hold that deliberate indifference meets the conscience-shocking standard when an officer recklessly speeds without any legitimate reason to hurry. *Lewis* tied the choice of standard to two variables: time and exigency. Deliberate indifference "is sensibly employed only when actual deliberation is practical," while the exacting intent-to-harm test is reserved for the "unforeseen circumstances [that] demand an officer's instant judgment." *Lewis*, 523 U.S. at 853. That is why the Court imposed the intent-to-harm requirement in the pursuit setting it confronted: a "high-speed chase" in which the officer must "act decisively and …

show restraint at the same moment," pulled by "obligations that tend to tug against each other" and afforded "little time in which to deliberate." *Id.*

Following *Lewis*, the circuit courts have consistently held that this rationale does not support application of an intent-to-harm standard to an officer who is speeding for no good reason. In *Browder v. City of Albuquerque*, the Tenth Circuit (in an opinion authored by then-Judge Neil Gorsuch), held that intent to harm is unnecessary where the speeding officer "faces no tug between duties owed to two sets of innocents, there is no emergency, no one has called for his aid, and he sits instead in the same place as everyone else when it comes to respecting the rights of others." 787 F.3d 1076, 1081 (10th Cir. 2015). The Fourth, Seventh, and Third Circuits (the first two with express reliance on *Browder*) have held the same: "when an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 415 (4th Cir. 2020); *see also Flores v. City of S. Bend*, 997 F.3d 725, 729 (7th Cir. 2021); *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018).

This Court has never held otherwise. Its application of an intent-to-harm standard has been limited to genuine pursuits, where the standard fits. *See O'Neal v. Cazes*, 257 F. App'x 710 (5th Cir. 2007). The Court's unpublished decisions that

Houston relies on for other purposes also applied a standard of deliberate indifference in the context of non-emergency police speeding. *See Daniels v. City of Dallas,* 272 Fed. Appx. 321 (5th Cir. 2008); *Smith v. Walden*, 228 F.3d 408 (Table) (5th Cir. 2000).

**3. Substantial evidence supports the jury's decision that Cabrera acted with deliberate indifference.**

Application of a deliberate indifference standard in cases where a police officer injures or kills a person while speeding for no good reason has an obvious corollary: if the plaintiff proves that the officer was driving at an obviously dangerous speed for no good reason, the plaintiff meets the standard of deliberate indifference.

Relying on this Court's non-precedential decisions in *Daniels* and *Smith*, Houston argues that, even if a standard of deliberate indifference is applied, Cabrera's actions would not constitute deliberate indifference unless he "'knew an accident was imminent but consciously and culpably refused to prevent it.'" *Daniels*, 272 Fed. Appx. at 322 (quoting *Hill v. Shobe*, 93 F.3d 418 (7th Cir. 1996)); *see also Smith*, 228 F.3d 408. As a threshold matter, this analysis is incompatible with *Lewis* in that it collapses the distinction between intent to harm and conscious indifference and should not be followed here. It is also doubtful whether these decisions remain, or were ever, good law. *Smith* is a two-paragraph decision with no discussion of the relevant standard, and *Daniels* relied on pre-*Lewis* precedent from the Seventh

Circuit requiring intent to harm in non-emergency situations, 272 Fed. Appx. at 322 (quoting *Hill*, 93 F.3d at 421). But the Seventh Circuit, relying on *Lewis* and distinguishing *Hill*, has since made clear that an officer who recklessly speeds through an intersection for no good reason meets the standard of deliberate indifference. *See Flores*, 997 F.3d at 729-30.

*Daniels* and *Smith* are also distinguishable from this case in that both officers were speeding ***in response to police calls***, even if those calls were classified as "non-emergencies." *See Daniels*, 272 Fed. Appx. at 322-23 (noting that officer was responding to backup call and characterizing *Smith* as involving "an officer who was speeding without lights or a siren in response to a non-emergency call"). In both cases, the officers were required to balance, at least, the urgent public safety interest in fighting crime against the danger that their speeding posed to others on the road. This case is different because Cabrera was ***not*** responding to a call when he killed Charles Payne. He had completed his response to an earlier call, stopped for breakfast, and was driving back to his precinct to complete paperwork. This Court has never held – and should not hold – that the mere need to complete paperwork can justify driving at dangerous speeds, or that an officer's clerical obligations require the kind of "instant judgment" that would excuse conscious indifference to the constitutional rights of others.

In this case, there was ample evidence to support the jury's finding of conscious indifference. Cabrera "face[d] no tug between duties owed to two sets of innocents." *Browder*, 787 F.3d at 1081. "There [wa]s no emergency, no one ha[d] called for his aid, and he s[at] instead in the same place as everyone else when it comes to respecting the rights of others." *Id.* at 1081. Though he had time to stop for breakfast, he then drove in excess of 70 m.p.h. on a busy, multi-lane city street with a speed limit of 35 m.p.h. for no better reason than to complete some paperwork. He did not bother to alert other drivers to the presence of a speeding police cruiser by activating his lights or siren, and he did not bother to keep his eyes on the road while driving twice the posted speed limit. His conduct was obviously dangerous, evinced utter contempt for the safety of everyone else on the road, and carried an intolerably high risk of killing innocent people. Which is exactly what he did.

### C. Substantial Evidence Supports the Jury's Finding of Municipal Liability Under *Monell*.

Once the plaintiff establishes a constitutional violation by a municipal officer, the plaintiff must prove three elements to impute liability to the municipality itself: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578-79 (5th Cir. 2001); *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 282 (5th Cir. 2016).

### 1. Plaintiffs identified the correct policymaker at trial

Policymaker status is a question of law. *See City of St. Louis v. Praportnik*, 485 U.S. 112, 124 (1988). This Court has never required Plaintiffs to ***prove*** who the relevant policymaker is. Instead, this Court has required plaintiffs to "***identify***" the correct policymaker. *Piortowski*, 237 at 578-79. Plaintiffs did so in this case by calling a witness – Captain Duplechain, Houston's designee on the subject of its policies – who clearly and repeatedly identified Chief Finner as the policymaker. ROA.6629-33, 6635-36. Plaintiffs also introduced the written policy signed by the Chief of Police himself, which Duplechain testified was consistent with Houston's pre-collision policy. ROA.6629-33, 7410. No contradictory evidence or argument identifying any other policymaker was introduced at trial, and Houston devoted a substantial part of its closing to arguing that Plaintiffs had failed to connect the Chief of Police with Houston's official policy. ROA.6997-7000.

Houston fundamentally misinterprets the identification requirement to mean that plaintiffs must identify the policymaker ***in their pleadings***, and that the failure to name him in the Joint Pretrial Order[1] (somehow) requires rendition. That argument is wrong. This Court has never required plaintiffs to identify the policymaker in their pleadings. To the contrary, it has repeatedly held that plaintiffs do not need to identify a policymaker in their pleadings at all. *See Groden*, 826 F.3d

[1] The Joint Pretrial Order was never signed or accepted by the Trial Court. ROA.2806.

at 282; *Thompson v. McGehee*, 183 F.4th 353, 372 (5th Cir. 2026). What plaintiffs must do, in both their pleadings and their proof, is present ***facts*** sufficient to allow a reasonable juror to conclude that the legally relevant policymaker promulgated (either formally or through deliberate indifference to a widespread custom) a policy that was the moving force behind the constitutional violation. Facts – "which must be pled in a complaint and ultimately proven to a jury" – do not include questions of law like policymaker identity. *Groden*, 826 F.3d at 285.

### 2. Plaintiffs presented substantial evidence of a municipal policy of which the policymaker had actual or constructive knowledge

#### *a. Legal standards*

Even a facially innocuous policy "will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (quoting *Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). Liability in such cases flows from the municipality's deliberately indifferent implementation of a facially innocuous policy, not any defect on its face. *See generally id.* Deliberate indifference "'require[s] proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan Cnty.*, 520 U.S. at 410). While plaintiffs typically must show a "pattern of similar violations," *Piotrowski*, 237 F.3d at 579, deliberate indifference may also be

established where a constitutional violation would be the "'highly predictable consequence'" of the policy in question, *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d. 468, 484 (5th Cir. 2014) (quoting *Connick*, 563 U.S. at 64). *See generally Bryan Cnty.*, 520 U.S. at 409; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

A plaintiff may also establish a policy through custom—"[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803 (5th Cir. 2017); *see also Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Such a practice is proven through evidence that similar conduct "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body [or delegated final policymaker] of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.3d at 841. This Court has held that consistent officer testimony that a practice is standard and widespread proves both a customary policy and the policymaker's actual or constructive knowledge of it, even without specific examples of other constitutional deprivations. *See Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509-11 (5th Cir. 2022); *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016). Evidence of "policymakers failing to take corrective action after

their subordinates violate the constitution is [also] some evidence that they know about an unconstitutional custom." *Moore*, 41 F.4th at 510.

Finally, a municipality's failure to train or supervise employees may itself constitute a policy or custom where it amounts to deliberate indifference to the rights of those the employees encounter. *Canton*, 489 U.S. at 389. Where a municipal entity adopts a facially valid policy but fails to train employees to carry it out constitutionally, "that failure constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate indifference.'" *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 388). Deliberate indifference is shown where, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Id.* As with unconstitutional implementation of facially constitutional policies, deliberate indifference can be proven either by a pattern of similar violations or by "infer[ence] if the factfinder determines that the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409). An inference of deliberate indifference is permissible where the municipality "'fail[ed] to train its employees concerning a clear constitutional duty implicated in

recurrent situations that a particular employee is certain to face.'" *Id.* (quoting *Canton*, 489 U.S. at 396.

*b. Plaintiffs presented substantial evidence of an unconstitutional policy*

The record contains direct evidence of an official policy: Houston's own designated policymaking witness, Captain Duplechain, testified that HPD's official policy and training allow officers to drive at any speed they judge appropriate under the "totality of the circumstances," treating the posted speed limit as irrelevant even absent an emergency. ROA.6613-18, 6617, 6624, 6640. Duplechain did not merely describe this policy in the abstract, he applied it to Cabrera's driving the day he killed Charles Payne, confirming that it was "not unreasonable" for Cabrera to drive 70 m.p.h. in a 35-m.p.h. zone under the circumstances presented, and that he himself had done the same while on duty and not responding to an emergency. ROA.6617, 6628-29, 6637, 6640, 6655. That testimony alone satisfies *Monell*'s policy requirement: a facially neutral "totality of the circumstances" standard "will support liability if it was promulgated with deliberate indifference to the known or obvious consequences" that constitutional violations would result, *Piotrowski*, 237 F.3d at 579, and a policy that expressly excuses officers from any obligation to observe posted speed limits in non-emergencies makes constitutional violations not merely foreseeable but, as this case shows, inevitable. Cabrera's own testimony confirms the point: he understood "due regard" for the public to include exceeding posted

limits even when no emergency was present, and he testified that his conduct on December 26, 2021 complied with Department policy. ROA.6599, 6601, 6585-86.

The evidence also establishes that Chief Finner—the policymaker Duplechain identified as the author of HPD's driving policy, ROA.6629-33, 7410—had both actual and constructive knowledge of it. Actual knowledge is established directly: only four days after Mr. Payne's death, the Chief personally signed a circular reiterating the same policy without modification, instructing officers to exercise "due care" and "good judgment" based on road and traffic conditions but never mentioning the speed limit as a constraint, "regardless whether [the officer is] responding to an emergency call." ROA.6629-33, 7410. Under *Moore*, a policymaker's failure to take corrective action after a constitutional violation is itself evidence that the policymaker knew of the unconstitutional custom, 41 F.4th at 510; here, Chief Finner did not merely fail to correct the policy after learning it had caused a fatal collision—he affirmatively republished it unchanged. Constructive knowledge is independently established by the duration and frequency of the practice the policy authorized. Cabrera himself had repeatedly driven at excessive speeds—AVL data recovered after the collision showed speeds up to 102 m.p.h. on surface streets on numerous occasions in the months before Payne's death—without ever being disciplined or even questioned. ROA.6579-83, 6600. And Cabrera was not an outlier: AVL data collected from patrol vehicles across a five-mile radius of

his station documented officers repeatedly driving 85 to 94 m.p.h., and Internal Affairs records showed at least two other officers—Valdez and Curtis—reaching speeds as high as 105 and 114 m.p.h. outside any emergency. ROA.7210-16. Under *Webster* and *Montano*, consistent evidence that a practice is standard and widespread is itself sufficient to prove that the objectionable conduct was the "expected, accepted practice" attributable to the policymaker's knowledge, without need for a catalogue of similar events. 735 F.2d at 841; 842 F.3d at 875.

#### 3. Plaintiffs presented substantial evidence that the policy was the moving force behind the deprivation of Mr. Payne's constitutional rights

##### *a. Legal standards*

Finally, a plaintiff must show the municipal policy or custom was the "moving force" behind the constitutional violation—a requirement originating in *Monell*, which held that a local government is responsible "when execution of a government's policy or custom ...inflicts the injury," and that the policy was "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694. A plaintiff satisfies this element with sufficient evidence for the jury to find "'a direct causal link between the municipal policy and the constitutional deprivation." *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 761 (5th Cir. 2023) (quoting *Piotrowski*, 237 F.3d at 580). This Court requires proof that the policy is the "actual

cause" of the deprivation, not merely a "but-for" cause or contributing factor. *Valle v. City of Houston*, 61 F.3d 536, 546 (5th Cir. 2010).

This Court has also treated culpability—deliberate indifference—as a component of the "moving force" inquiry. See *Loera v. Kingsville Indep. Sch. Dist.*, 151 F.4th 813, 819 (5th Cir. 2025). Because deliberate indifference itself depends on the known or obvious nature of the violations likely to result from a policy, that predictability may also support an inference of causation: that the municipality's indifference led directly to its obvious consequence. *Bryan Cnty.*, 520 U.S. at 409-10. Where liability rests on a failure to train or supervise, or on implementation of a facially innocuous policy, causation may thus be inferred from the predictable consequences of the municipality's choice. *Id.*

##### *b. Houston's policy of allowing speeding in non-emergency situations was the moving force behind the violation of Mr. Payne's constitutional rights*

Trial evidence established far more than a "but-for" or contributing-factor relationship between HPD's policy and Charles Payne's death—it established the policy was the actual, direct cause of the collision. Cabrera drove 70 m.p.h. in a 35-m.p.h. zone because Department policy and training permitted it, confirmed by Houston's designated policy witness, who testified a reasonable officer could have driven exactly as Cabrera did in accordance with Houston's policy and training, and by Cabrera's own testimony that his conduct complied with policy. ROA.6613-18,

6617, 6637, 6640, 6601-02. The reconstruction evidence closed the causal loop: had Cabrera not traveled at the speed Houston's policy allowed, Payne would have cleared North Shepherd before Cabrera reached the intersection. ROA.6399, 6400, 6419, 6431-36, 6440. This is not a case where the policy merely set events in motion that an intervening cause carried to their conclusion; its operative feature—letting officers disregard the posted limit absent an emergency—put Cabrera's patrol car in Payne's path at a speed and moment the collision could not be avoided. The jury was entitled to find Houston's speeding policy the actual cause of the deprivation, not a mere background condition. *Valle*, 61 F.3d at 546; *St. Maron Props.*, 78 F.4th at 754.

The evidence of deliberate indifference independently supported causation: the same predictability establishing the City's culpability also shows its indifference led directly to the anticipated consequence. Houston's own AVL data—reflecting officers Department-wide, including Cabrera, repeatedly traveling 85 to over 100 m.p.h. on ordinary surface streets with no corrective action—showed a policy permitting unlimited non-emergency speed made a high-speed collision not merely foreseeable, but highly predictable. ROA.6579-82, 7166-68, 7207-16, 6582-83, 6600, 7941-8396, 7369. That the City had classified that stretch of North Shepherd as part of its High Injury Network, with fifty crashes there in six months, only sharpened how obvious the risk was. ROA.6656-59, 7665-7701, 8402-03. Under *Loera* and *Bryan County*, where a policy's predictable consequences establish

deliberate indifference, that predictability also supports the inference that the policy's execution—not some independent or unforeseeable event—produced the harm. The jury did not need to infer causation from speculation: the policy permitted officers to drive whatever speed they deemed prudent, regardless of posted speed limits. Cabrera's conduct on December 26, 2021, driving without even knowing the speed limits he repeatedly violated that morning, was the obvious result. The Chief's failure to correct the practice after Payne's death—reaffirming rather than revising the policy days later—confirms the collision was the direct product of the City's indifference, not an intervening or unrelated cause. *See Moore*, 41 F.4th at 510.

Houston's arguments regarding Payne's coronary narrowing, post-collision glucose and EKG readings, and its CPR theory ask this Court to do what it cannot do on appeal: reweigh conflicting evidence and credit testimony the jury rejected. Dr. Ross—the board-certified medical examiner who performed the autopsy—testified to a reasonable degree of medical certainty that the collision, not natural disease, a preexisting condition, or CPR, caused Payne's death, excluding the coronary narrowing, elevated glucose, and thyroid condition as causes. ROA.6811-16, 7108-11, 7124-27, 7129-31, 7141-42. The jury was entitled to credit Dr. Ross's neutral, evidence-based conclusions over Dr. Totz's concededly uncertain opinion, and this Court "cannot substitute other inferences that [it] might regard as more

reasonable" for the jury's own. *Eastman Chem. Co. v.* Plastipure, Inc. 775 F.3d 230, 238 (5th Cir. 2014).

## II. HOUSTON IS NOT ENTITLED TO A NEW TRIAL

### A. Standard of Review and Harmless Error Principles.

The denial of a motion for new trial is reviewed only for abuse of discretion, and that review is especially deferential where, as here, the trial court's decision is consistent with the jury's verdict. The decision whether to grant a new trial "rests in the sound discretion of the trial judge," and "will be affirmed unless there is a clear showing of an absolute absence of evidence to support the jury's verdict." *Heckman v. Gonzalez-Caballero*, 65 F.4th 222, 226-27 (5th Cir. 2023) (quotations omitted). That deference is at its highest where, as here, the trial judge has left the decision of the jury intact. *Id.* This standard of review reflects "the great deference [the court] accord[s] the decision by the trial judge, who was present and heard the evidence, to deny a new trial motion" – a decision that is "not lightly reversed." *Whitehead v. Food Max. of Miss.*, 163 F.3d 265, 276 (5th Cir. 1998) (quotations omitted). This is an "especially deferential review posture," more deferential still than review of a motion for judgment as a matter of law, and the burden Appellant must carry is correspondingly heavy. *Crear v. Horn*, 578 F. App'x 435, 438 (5th Cir. 2014).

### B. The Trial Court's Charge Was Neither Erroneous nor Harmful

#### 1. Legal standards

This Court reviews alleged charge errors for abuse of discretion, and that review is doubly deferential where, as here, the Trial Court adhered to this Circuit's Pattern Jury Instructions and declined the Appellant's request to supplement them. A district court has "broad discretion in formulating the charge" and "is under no obligation to couch the charge in terms requested by counsel." *Davis v. Avondale Indus., Inc.*, 975 F.2d 169, 174 (5th Cir. 1992). That discretion is strongest when the court's charge hews to the pattern instructions: a district court "'***does not err*** by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law.'" *U.S. v. Brannan*, 98 F.4th 636, 638-39 (5th Cir. 2024) (quoting *U.S. v. Richardson*, 676 F.3d 491, 507 (5th Cir. 2012) (emphasis added); *United States v. Arthur*, 51 F.4th 560, 567-68 (5th Cir. 2022). As long as the pattern "substantially covers" an "otherwise correct statement of law supplementally requested by the defendant," *U.S. v. Hernandez-Adame*, 157 F.4th 662, 671 (5th Cir. 2025), the pattern instructions operate as a "safe harbor," requiring Appellant to demonstrate some error in the pattern, *U.S. v. Cessa*, 856 F.3d 370, 377 (5th Cir. 2017).

Even when the safe harbor does not apply, the Appellant must show: "(1) the requested instruction is a substantively correct statement of the law; (2) the requested

instruction is not substantially covered in the charge given to the jury; and (3) the omission of the instruction [must] seriously impair the defendant's ability to present his defense." *U.S. v. Dixon*, 185 F.3d 393, 403 (5th Cir. 1992); *see also Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004). This standard is not met if the defendant remained free to present and argue the grounds for its defense. *See Cessa*, 856 F.3d at 377; *Kanida*, 363 F.3d at 578.

Even then, Appellant's burden does not end. The charge "must be considered as a whole," and so long as the jury was not misled, prejudiced, or confused, and the charge is comprehensive and fundamentally accurate, it will be deemed adequate and without reversible error. *Davis*, 975 F.2d at 174-75. This Court reverses "only when the charge as a whole leaves the court with substantial and ineradicable doubt whether the jury was properly guided in its deliberations," and any error is subject to harmless-error review, requiring reversal only where the instruction "affected the outcome of the case." *Adams v. Mem'l Hermann*, 973 F.3d 343, 352 (5th Cir. 2020) (quotations omitted).

Finally, to preserve a charge error the "party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). This Court has construed the specificity requirement strictly, requiring the objection to be "sufficiently specific to bring into focus the precise nature of the alleged error."

*Russell v. Plano Bank & Trust*, 130 F.3d 715, 719-20 (5th Cir. 1997) (internal quotations omitted). A party may assign error to a trial court's failure to give an instruction only if the party properly requested the instruction and also properly objected, "unless the trial court rejected the request in a definitive ruling on the record." Fed. R. Civ. P. 51(d)(1)(B). In the absence of a proper objection, this Court reviews alleged charge errors for plain error. *Russell*, 130 F.3d at 721.

### 2. The Trial Court's denial of an instruction naming the policymaker was neither erroneous nor harmful

Houston argues that the Trial Court erred by denying its requested instruction naming the policymaker as Chief Finner. Houston is wrong.

First, to the extent Houston's complaint is that the Court allowed the jury to decide a question of law, Houston has waived the complaint by affirmatively encouraging the jury to do exactly that. Notwithstanding its later arguments during the charge conference, Houston opened its case this way:

> Ms. Martin: The second leg of the stool, area of testimony that I want you to listen for is policymaker. ***Who is the chief policymaker, decision-maker for the Houston Police Department?*** I anticipate plaintiffs will indicate that Officer Duplechain, Captain Duplechain is that person. If that is the evidence you hear, what I want you to listen for and ask yourself is what about the chief? What about the chief of the Houston Police Department? And then ***I want you to see if plaintiff's case gives you evidence to answer that question, okay?***

ROA.6387-88 (emphasis added). This Court has repeatedly held that a party who invites error through improper arguments to the jury may not later complain of the same errors on appeal absent manifest injustice. *See*, *e.g.*, *U.S. v. Rodrigo*, 934 F.2d 595, 598 (5th Cir. 1991); *U.S. v. Green*, 272 F.3d 748, 755 (5th Cir. 2001).

Houston also failed to preserve this objection at the charge conference. Although Houston modified the pattern instruction in its proposed instructions to replace "policymaker" with "chief of police," its argument during the charge conference was that the Trial Court "can" – not must – "decide as a matter of law who the chief policymaker is." ROA.6849. Houston also relied on *Piotrowski* to support its request for a specific identification. ROA.6848-51. But *Piotrowski* does not discuss policymaker status in the context of jury instructions at all, *see* 237 F.3d at 578-79, much less hold that "in either the instructions or the jury interrogatories, the plaintiff has to specifically identify" the policymaker, as Houston incorrectly argued during the charge conference. ROA.6850. An argument that mischaracterizes inapposite case law necessarily fails to present an objection "sufficiently specific to bring into focus the precise nature of the alleged error." *Russell*, 130 F.3d at 719-20.

Nor can Houston carry its burden of showing harmful error in the Court's charge. This Court has found error only when a jury charge affirmatively identified the *wrong* policymaker, thus inviting the jury to decide a question of law incorrectly. *See Flores v. Cameron Cnty., Tex.*, 92 F.3d 258, 270 (5th Cir. 1996); *Webster*, 735

F.2d at 841-42.[2] And the Court's Pattern Jury Instructions do ***not*** include an instruction naming the policymaker. Instead, the Court's pattern charge provides:

> To prevail on [his/her] claim against the [city/county], Plaintiff [name] must prove by a preponderance of the evidence that:
>
> 1. an official policy or custom existed;
> 2. a ***policymaker*** for the [city/county] knew or should have known about the policy or custom;
> 3. the ***policymaker*** was deliberately indifferent; and
> 4. the policy or custom was the moving force leading to the constitutional violation.

5th Cir. Pattern Jury Instructions § 10.5 (emphasis added). The Trial Court's charge conformed to the pattern in referring to the "policymaker" without a more specific identification. ROA.5776.

Because the Trial Court's instruction was a correct statement of law that conforms to the pattern instruction, Houston must show that its requested

---

[2] Houston relies on *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947-48 (8th Cir. 2017). But *Soltesz* is distinguishable in that municipal liability was based on the decision of the final policymaker – not, as here, based on a customary implementation of an official policy. *Cf. Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003) (identification of final policymaker required in cases based on action or decision of policymaker, but not in cases of customary policy). Moreover, *Soltesz* has not been cited at the circuit court level outside the Eighth Circuit, and does not require this Court to depart from its pattern charge. Other circuit courts have reached the opposite conclusion. *See Baron v. Suffolk Cnty. Sheriff's Dep't*, 402 F.3d 225, 240-43 (1st Cir. 2005) (judgment affirmed where charge did not identify a specific final policymaker but trial evidence identified the superintendent as the relevant policymaking official and it was "highly unlikely" the jury understood "policymakers" to mean other employees; also noting custom claims may not require identification of a single policymaker in the same manner as single-act claims), *abrogated on other grounds as recognized in Jennings v. Jones,* 587 F.3d 430 (1st Cir. 2009).

supplemental instruction is not "substantially covered" by the pattern and that it was "seriously impaired" in presenting its policymaker defense. *See Cessa*, 856 F.3d at 377; *Kanida*, 363 F.3d at 578. Houston shows neither.

Whether a given instruction "substantially covers" a refused instruction depends on whether the defendant's "theory of defense was substantially covered by the given charge." *U.S. v. MacHauer*, 403 Fed. Appx. 967, 971 (5th Cir. 2010); *accord U.S. v. Rubio*, 834 F.2d 442, 447 (5th Cir. 1987) (determinative question is whether the defendant's "theory is not effectively presented elsewhere in the charge"). This requires the Court to examine not just the four-corners of the charge, but also "'the contentions of the parties'" and the "'evidence presented at trial.'" *Rubio*, 834 F.2d at 447 (5th Cir. 1987). As long as the trial court gives a "charge on which" the appellant can "hang his … arguments," there is no error in refusing an additional instruction. *Id.* at 450. Similar considerations govern the "seriously impaired" prong of this Court's inquiry, which this Court has "interpreted … to mean that 'an abuse of discretion occurs only when the failure to give a requested instruction serves to prevent the jury from considering the defendant's defense.'" *U.S. v. Greenlaw*, 84 F.4th 325, 353 (5th Cir. 2023) (quoting *United States v. Hunt*, 794 F.2d 1095, 1097 (5th Cir. 1986)).

Here, Houston's policymaker defense theory is that Appellees failed to present evidence connecting Chief Finner to the challenged municipal policy and

failed to show that Chief Finner promulgated the policy with deliberate indifference. But these theories of defense were "substantially covered" by the charge, which expressly required the jury to find that the policymaker knew or should have known of the challenged policy or custom and that the policymaker was deliberately indifferent. ROA.5776. Nothing prevented Houston from "hanging its arguments" on that charge, *cf. Rubio,* 834 F.2d at 450, and Houston did indeed present argument to the jury – with specific reference to the Court's charge – regarding Chief Finner's policymaker status and Appellees' supposed failure to connect him to the challenged policy. Houston's counsel explicitly "hung" this argument on the Court's charge in her closing:

> Ms. Martin: The only evidence you have in the record is that the chief of police promulgated policies that require officers to drive reasonably and prudently. Even in the circular that plaintiffs were discussing in their opening, Chief Finner reemphasized you have to drive reasonably and prudently. **Now, if we go back to your instructions, it's at the bottom of Page 7 and going on to Page 8. For the official policymaker to have acted with deliberate indifference, plaintiffs have to prove that the official must have – not only could have drawn an inference, but actually did draw an inference that a substantial risk of serious harm exists as a result of Houston's training or policy. That's where plaintiffs have given you no evidence.**

ROA.6997-98; *see also* ROA.6998 (arguing that Appellees failed to show Chief Finner was aware of AVL data); ROA.7000 (arguing "the chief must be deliberately indifferent"). On this record, Houston cannot demonstrate either that its requested

instruction was not "substantially covered" by the charge given or that it was "seriously impaired" in presenting its defense.

### 3. Instruction No. 7 was neither erroneous nor harmful

Houston argues that the first sentences of Instruction No. 7 "effectively suggested that the trial court had already found (i) the policies were unconstitutional; and (ii) they injured Payne, usurping the jury's role as factfinder." (App. Br. at 46). As a threshold matter, Houston did not articulate this objection or obtain a ruling on it during the charge conference. The only comment that Houston made – "And also it's not as – it's not framed as an allegation. It's as if the Court is instructing" – concerned the instruction's description of Plaintiffs' failure to supervise theory. ROA.6865-66. Houston did not raise this objection to the other portions of Instruction 7, and never obtained a definitive ruling on the Trial Court's failure to give its proposed alternative. But Houston has not argued or attempted to show plain error.

Even if preserved, the objection is meritless. "Portions of a charge are not to be scrutinized on appeal apart from their context as isolated verbal phenomena." *Lyne v. R. N. Adams. Constr. Co.*, 402 F.2d 323, 328 (5th Cir. 1968). "The charge on the contrary must on appeal be looked at as a whole." *Id.* Houston's argument isolates the introductory sentences of Instruction No. 7 as standalone "verbal phenomena," ignoring the rest of the instruction, which makes clear that "[t]o prevail

on their claim against the City of Houston, Plaintiffs must prove by a preponderance of the evidence" that a policy existed, the policymaker knew or should have known of it, the policymaker was deliberately indifferent, and the policy was the moving force behind the deprivation of Mr. Payne's rights. ROA.5776. Considered as a whole, Instruction No. 7 leaves no doubt about Plaintiffs' burden of proof, and is neither erroneous nor harmful.

#### 4. The Trial Court did not err by refusing Houston's requested instruction on the Texas Transportation Code

Houston requested a lengthy instruction on several provisions of the Texas Transportation Code that the Trial Court was right to refuse. The issue in this case was not whether either of the drivers complied with the Transportation Code. (App. Br. at 46). The issue was whether Houston maintained an unconstitutional policy with deliberate indifference that was the moving force behind the deprivation of Mr. Payne's constitutional rights. Municipal policy, not state law, controls. The requested instruction would only have led the jurors into an irrelevant deliberation over traffic violations – one depending in large part on statutory terms of art that Houston's proposed charge did not define, *cf.* Tex. Transp. Code § 541.201 (defining "authorized emergency vehicle").

Houston's proposed instruction was also incorrect. Houston asked for an instruction stating: "The regulation of the speed of a vehicle ***under the Transportation Code*** does not apply to an authorized emergency vehicle responding

to a call or a police patrol," citing Transportation Code Section 545.365. ROA.5749 (emphasis added). But Section 545.365 does not say that; it says: "[t]he regulation of speed ***under this subchapter*** does not apply to an authorized emergency vehicle responding to a call or a police patrol." Tex. Transp. Code § 545.365 (emphasis added). Subchapter 545 is not the same thing as the entire Transportation Code, and there ***are*** applicable speed regulations under other subchapters, most notably Section 546.001, which permits an authorized emergency vehicle to exceed the maximum posted speed limit only "as long as the operator does not endanger life or property." Tex. Transp. Code § 546.001. Section 546.002 even more narrowly provides that an emergency vehicle can exceed posted speed limits only when it is "responding to an emergency call," which Cabrera was not doing. Tex. Transp. Code § 546.002(b)(1).

The Trial Court was not wrong to reject a proposed instruction that was misleading, incomplete, and materially incorrect. Houston has also failed to explain how its ability to present its defense was seriously impaired by the Court's rejection of this instruction, or how the error, if any, was harmful.

#### 5. The Trial Court did not err by instructing the jury on Plaintiffs' *Monell* theories of liability

Houston's objection to the Trial Court's description of Plaintiffs' *Monell* theories is simply a complaint that the court did not adopt its preferred phraseology. But the Trial Court was "under no obligation to couch the charge in terms requested

by counsel," *Davis*, 975 F.2d at 174. Plaintiffs' pleadings from the Complaint through the Joint Pretrial Order put Defendant on notice that Plaintiffs were alleging a policy of permitting reckless driving in excess of the speed limit regardless of whether an emergency justified it, ROA.28–57, 2134–45, 1819–20, and Defendant cites no authority for its argument that a new trial is required because the Court gave a more precise statement of the policy at issue after all of the evidence received at trial. A difference in articulation of the Plaintiffs' theories of liability is not erroneous, and Houston makes no attempt to show that any error was harmful.

#### 6. The Trial Court did not use the wrong due process standard

Houston argues that the Trial Court erred by failing to instruct the jury that it was required to find intent to harm to find a constitutional violation. Houston is wrong for all of the reasons discussed in Section I.A, *supra.* Deliberate indifference, not intent to harm, is the correct standard here. *See Lewis*, 523 U.S at 850.

#### 7. The Trial Court did not use the wrong standard for deliberate indifference

Defendant argues that the Court "defined 'deliberate indifference' using the same subjective standard as that for the underlying constitutional violation," instead of the "objective standard" applicable to a municipal violation. (App. Br. at 51). But the Court used the Fifth Circuit's pattern language for "deliberate indifference" in the context of municipal liability. *See* Fifth Circuit Pattern Civil Jury Instructions § 10.5. As written in the pattern, and the charge, this objective standard applies to the

policymaker's culpability. There was no error in the Court's charge in this regard, and even if there was, Houston has not shown that it was harmful.

Houston's additional complaint – that the charge did not instruct the jury that a finding of deliberate indifference "ordinarily" requires proof of a pattern of similar violations – is not an objection that Houston raised at the charge conference, and Houston has failed to argue plain error. The Trial Court's charge conformed to the pattern, and Houston has failed to show harm.

### 8. The charge did not "dilute" the moving force standard

Houston complains that the Trial Court "diluted the moving force standard to 'acquiesces to and permits.'" (App. Br. at 65). It did no such thing. The Trial Court instructed the jury that "[t]o establish that the policy, custom, or inadequate training or supervision policy or procedure was the 'moving force,' the policy, custom, or inadequate training or supervision policy or procedure must have a direct causal link to the violation of Mr. Payne's constitutional rights." ROA.5778. That instruction is a correct statement of this Court's definition of moving force. *See St. Maron Props.*, 78 F.4th at 761 (quoting *Piotrowski*, 237 F.3d at 580). Houston also raised no objection during the charge conference that the "acquiesces and permits" language – which appears in the statement of Plaintiffs' *Monell* theories, not the definition of "moving force" ROA.5775, 5778 – dilutes the moving force requirement. Houston has thus failed to show error or that the error was preserved, and it has not attempted

to show plain error. Nor could any such error have been harmful given the Court's correct definition of "moving force" as "a direct causal link."

#### 9. The charge was not erroneous in submitting training and supervision theories in a single question.

Houston complains that the Trial Court asked the jury whether Houston's "failure to train ***or*** supervise" caused Mr. Payne's constitutional injury. (App Br. at 52-53). The disjunctive charge was not error. This Court has consistently treated failure-to-train and failure-to-supervise as equivalent theories and has consistently phrased the test in the disjunctive. *See*, *e.g.*, *Trammel v. Fruge*, 868 F.3d 332, 344 n.11 (5th Cir. 2017); *Burge v. Tammany Par.*, 335 F.3d 363, 370 (5th Cir. 2003); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Houston has also failed to show how any error was harmful, since its harm argument is premised on the incorrect contention that the jury must find *both* failures to assign liability. *Cf. Burge* 335 F.3d at 370; *Thompson*, 245 F.3d at 459.

### C. The Trial Court's Evidentiary Rulings Were Neither Erroneous nor Harmful

"Evidentiary rulings are reviewed under a deferential abuse of discretion standard, and are subject to the harmless error doctrine." *Adams*, 973 F.3d at 349 (quotations omitted). "[E]ven if the district court abused its discretion, the ruling will be reversed only if it affected the substantial rights of the complaining party." *Id.*

Houston complains that the Court allowed Plaintiffs' expert witness Christopher Darcy to testify about Plaintiffs' Exhibit 26, AVL data produced in discovery by Houston itself. (App. Br. at 54). Houston produced the exhibit itself, and its counsel admitted at trial that it was aware of the exhibit and its contents when it turned it over to Plaintiffs. ROA.7180. Houston's arguments about Darcy's testimony are also misleading. Darcy's report ***did*** opine on AVL data and put Houston on notice that he would offer an opinion that the AVL data produced by Houston showed a pattern of excessive speeding by Houston police officers. ROA.2137, 7181-83. While Darcy's report did not specifically mention Exhibit 26, there was no unfair surprise in his testifying about additional AVL data produced by Houston – particularly when Houston's counsel chose to suspend Mr. Darcy's deposition without ever reconvening him to ask questions about the AVL data he relied on. ROA.7177-78. And Houston's assertion that "Darcy was unable to identify the exhibit" is just false. (App. Br. at 54).[3] Mr. Darcy immediately identified the exhibit for what it was – "a document that shows AVL data from police cars in the City of Houston." ROA.7166. While he was initially unable to identify the time period that the exhibit covered due to the small type ***in the printed exhibit***, ROA.7166-67, he easily did so when he was shown the exhibit in electronic form

[3] Houston cites ROA.7108-09 for this assertion, but Mr. Darcy's testimony does not even begin until ROA.7144.

and was able to zoom in and read it, ROA.7207. Houston also fails to demonstrate how the admission of this evidence affected the jury's verdict.

Houston also complains that the Trial Court excluded evidence that Mr. Payne was "estranged" from members of his family for periods of time, including a 2008 divorce petition and periods that Mr. Payne spent incarcerated between 1990-1992 and 1980-1982. But the Trial Court's careful weighing of the marginal probativeness of this evidence against its obvious potential for prejudice is no ground for reversal. This is especially so since Mr. and Mrs. Payne never divorced, were married at the time of Mr. Payne's death, and Plaintiffs offered one of Mr. Payne's children to testify about the supposed separation, which Houston rejected. ROA.6914–16, 6078. Houston has also failed to explain how any error in excluding this evidence was harmful.

Finally, Houston argues that it should have been allowed to introduce evidence that Mr. Payne had marijuana "in his system" and was not wearing his seatbelt at the time of his death. (App. Br. at 56). But the seatbelt evidence was limited to hearsay statements that Mr. Payne was not belted by the time first responders arrived, not that he was unbelted ***at the time of the accident***, which he survived. ROA.5552–54, 6157–62. And Houston offered no evidence that would show the concentration of THC in Mr. Payne's blood at the time of the collision, and Defendant's medical expert admitted that he was unable to say whether the THC in

Mr. Payne's blood would have affected his judgment. ROA.6145–47, 6151–53, 2221, 5548–52. Both pieces of evidence were highly prejudicial and only remotely probative, if at all, and the Trial Court did not err by excluding them. Nor has Houston explained how any error was harmful.

### D. The Trial Court Did Not Subject Houston to "Trial by Ambush"

Unfair surprise justifies a new trial only where it is "inconsistent with substantial justice" and actually prejudices the movant's case. *See Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111–12 (5th Cir. 1982); Fed. R. Civ. P. 61. This Court has further limited reversal based on surprise to two narrow circumstances: (1) when a completely new issue is raised at trial, or (2) when a previously unidentified expert witness is suddenly called to testify. *Conway*, 687 F.2d at 112; *F & S Offshore, Inc. v. K. O. Steel Castings, Inc.*, 662 F.2d 1104, 1108 (5th Cir. 1981). Neither circumstance is present here. This Court also "look[s] with disfavor on claims of unfair surprise by parties who did not attempt to counter the opponent's testimony" by requesting a continuance. *Rodriguez v. Crown Equip. Corp.*, 923 F.2d 416, 418 (5th Cir. 1991). Defendant never sought a continuance.

The jury charge restated allegations already in the Complaint. Paragraph 59(a) separately and distinctly alleged "a policy of officers driving with reckless disregard to the lives and rights of civilians," independent of the non-emergency-driving policy in paragraph 59(d). ROA.47. The charge conformed that pleaded policy to

the trial evidence, including testimony from Officer Cabrera and Captain Duplechain and the AVL speeding data. Refinement of a theory through discovery and trial is not the same as introducing a new one, and Houston never sought a continuance to address any perceived shift.

Nor can Houston credibly claim surprise at Darcy's testimony. Plaintiffs expressly disclosed that Darcy would testify about law-enforcement policies and procedures relating to the reckless conduct that caused Mr. Payne's death—necessarily encompassing opinions on excessive speed, including whether 90–100 mph driving is reckless regardless of emergency status. ROA.1973–89, 2122–46. Testimony squarely within the scope of a disclosure cannot be "surprise." Houston also suspended Darcy's deposition without ever reconvening it, and never requested a continuance—defeating any claim of prejudice from its own lack of diligence. ROA.2001–02, 2008–09.

Plaintiffs' "lost moments" argument was rhetoric, not a new damages theory. Plaintiffs pleaded and disclosed general wrongful-death damages; "lost moments" was closing-argument framing for the non-economic damages already supported by the evidence. The Trial Court heard the argument, overruled Defendant's objection, and instructed the jury on damages—yet Defendant sought no mistrial, corrective instruction, or continuance. Having gambled on the verdict, Defendant cannot now recast ordinary closing argument as grounds for a new trial.

### E. The Damages Awarded Were Not Excessive

A court may find a damages award excessive on one of two grounds: (1) the award is excessive compared to other awards for similar facts; or (2) the award "shocks the judicial conscience." *Montano*, 842 F.3d at 881.

Houston admits that it cannot demonstrate that damages were excessive by comparison to other awards. Nor can Houston show that the award in this case "shocks the judicial conscience." *Montano*, 842 F.3d at 881. The jury was properly instructed, heard admissible evidence concerning the loss suffered by Mr. Payne's widow and seven children, and returned reasoned, individualized awards to these eight claimants. *See Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). Defendant's argument relies almost entirely on evidence the Trial Court properly excluded as unfairly prejudicial. The jury's award must be evaluated based on the evidence admitted at trial, not speculation about evidence the Court ruled inadmissible.

## CONCLUSION

For all the foregoing reasons, this Court should affirm the Trial Court's certified final judgment on Appellees' *Monell* claim.

Respectfully submitted,

*/s/ James E. Sherry*

Paul A. Grinke (SBN 24032255)
Aaron Dekle (SBN 24100951)
Ben Crump Law, PLLC
5 Cowboys Way, Suite 300
Frisco, Texas 75034
(972) 942-0494
paul@bencrump.com
aaron@bencrump.com

Carl L. Evans, Jr. (SBN 24056989)
James E. Sherry (SBN 24086340)
Sarah E. Courtney (SBN 24142805)
McCathern Shokouhi & Evans PLLC
3710 Rawlins St., Ste 1600
Dallas, Texas 75219
(214) 741-2662
cevans@mccathernlaw.com
jsherry@mccathernlaw.com
scourtney@mccathernlaw.com

## CERTIFICATE OF SERVICE

I certify that on September 1, 2026, the foregoing document was filed with this Court using the Court's e-filing system, which will cause notice of the filing to be mailed to counsel of record for all parties.

*/s/ James E. Sherry*
James E. Sherry

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,970 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

/s/ James E. Sherry
James E. Sherry